U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 7

| 1. Program Code TDS-CK | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: Daniel R Soeffing, SA  At: PHILADELPHIA, PA DIVISION OFFICE | ☐ ☐ ☐ ☐ ☐ | | 6. File Title NIKPARVAR-FARD, Dr. Mehdi | |
| 7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By: | | | 8. Date Prepared 05-15-2017 | |
| 9. Other Officers: AUSA Jason Bologna, Chuan Ngo (FBI), Syreeta Scott (DoL), Marysol Mateo (OPM) | | | | |

10. Report Re: Proffer of Mitchell WHITE on 05-01-17

### SYNOPSIS

On May 1, 2017, Assistant United States Attorney (AUSA) Jason Bologna conducted a proffer session of Physician's Assistant Mitchell WHITE at the Office of the United States Attorney (OUSA) regarding WHITE's employment at Advanced Urgent Care (AUC) with Dr. Mehdi NIKPARVAR-FARD. WHITE's Attorney, Marc Neff was in attendance with the following Special Agents (SAs): Dan Soeffing (DEA), Chuan Ngo (FBI), Syreeta Scott (DoL), and Marysol Mateo (OPM).

### DETAILS

1. AUSA Bologna began the proffer session by explaining the nature of the meeting and the proffer letter; including the doctrine of derivative use. WHITE indicated that he understood and signed the proffer letter in the presence of Attorney Neff.

2. AUSA Bologna explained the nature of the investigation as it concerned illegal pre-signed prescriptions for Dr. Highland CAMPBELL and illegal prescriptions not relating to Highland CAMPBELL. WHITE indicated that he understood and had no questions.

3. WHITE stated that he was hired at AUC in May 2014 by Joann RIVERA, the Office Manager. WHITE stated that he interviewed with RIVERA and signed a single one (1) year contract which he never re-newed; as he refused RIVERA's request to re-new one week after the DEA Raid of AUC of July 9, 2015.

4. WHITE stated that Dr. NIKPARVAR-FARD is the AUC owner and medical director with no role in hiring; but a role as a secondary supervising physician. WHITE stated that Dr. Vincent THOMPSON was the primary supervising physician.

5. WHITE stated that he worked with Dr. NIKPARVAR-FARD approximately three (3) times at the same facility on the same day.

| 11. Distribution:  Division  District  Other   SARI/ODP | 12. Signature (Agent)  /s/ Daniel R Soeffing, SA | 13. Date 05-15-2017 |
|---|---|---|
| | 14. Approved (Name and Title)  /s/ Minh T Nguyen, GS | 15. Date 05-16-2017 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title NIKPARVAR-FARD, Dr. Mehdi | |
| 4. Page 2 of 7 | | |
| 5. Program Code TDS-CK | 6. Date Prepared 05-15-2017 | |

6. WHITE stated his last day or month at AUC was August 1, 2016, and that he never returned.

7. WHITE stated that a typical work week depended on what was needed and that he was originally scheduled with Dr. THOMPSON, then Dr. NIKPARVAR-FARD, while he (WHITE) waited for his DEA Registration to be approved. WHITE stated that he worked as a Physician's Assistant for approximately two (2) months at AUC before his DEA Registration was approved. WHITE stated that once his DEA Registration was approved he was sent to other AUC locations; working at City Line (60%), Roosevelt (30%), and the remainder at Montgomeryville and Willow Grove.

8. WHITE stated that AUC was his first Physician's Assistant job and he was taught there by Dr. THOMPSON. WHITE stated that he received his PA Degree from Drexel on December 12, 2013 and his undergraduate degree from Gwynedd Mercy in June 2010.

9. WHITE stated that there were a high volume of patients. WHITE stated that when he originally arrived in the morning, THOMPSON would give him (WHITE) scripts and THOMPSON would sign scripts and charts for pain/schedule II patients that WHITE saw and THOMPSON did not physically see. WHITE stated that he would write on the script the same care that was from the previous provider, so long as urine screens were acceptable to WHITE. WHITE stated that only the Company known as Millennium was utilized for the urine screens.

10. WHITE stated that the purpose of the urine screen was to see if prescribed drugs were being taken as prescribed and if any other (non-prescribed) drugs were in the system.

11. AUSA Bologna asked WHITE if there was some instruction at AUC on how patients may try and beat the drug screen; such as taking an oxycodone pill right before the urine test. WHITE replied that he was instructed to look at the metabolite number and that a patient with suboxone or heroin in his/her system should be discharged or offered drug treatment. WHITE stated that NIKPARVAR-FARD did not care about marijuana in a patient's system. WHITE stated that patients tested positive for heroin often and that a treatment addendum regarding pain management was sent via email by RIVERA. Agent's Note: This email and addendum were later delivered to SA Soeffing by WHITE's attorney.

12. WHITE stated that it was his impression, based on his experiences at AUC, that if something came from RIVERA, she was acting on behalf of NIKPARVAR-FARD.

13. WHITE stated that if a patient tested positive for a substance such as heroin, he would inform the patient that the patient could no longer be seen by him (WHITE), but that the patient could return, or go to another AUC location. WHITE stated that RIVERA told him he did not have the right to tell patients they could not

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**
*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. File Title | NIKPARVAR-FARD, Dr. Mehdi |
| 4. Page 3 of 7 | |
| 5. Program Code  TDS-CK | 6. Date Prepared  05-15-2017 |

return and that a letter stated that only RIVERA, NIKPARVAR-FARD and Mark KENNEDY could discharge patients. Agent's Note: A copy of such a document exists: Ex. N-57.

14. WHITE stated that KENNEDY sent him home on one occasion and that it did not feel right taking orders from KENNEDY and RIVERA as they were not medical professionals.

15. WHITE stated that NIKPARVAR-FARD utilized racial slurs (specifically the "N" word), cutting his hours and firing him until he obtained a DEA Registration; RIVERA being the one to re-hire WHITE. WHITE believes RIVERA to be the number two person at AUC.

16. In April/May 2016 at Montgomeryville, WHITE received a call from NIKPARVAR-FARD who told WHITE that the patients did not like him as per the Medical Assistants. WHITE stated that NIKPARVAR-FARD also told him that, looking at the numbers he (WHITE) was not seeing as many patients as other practitioners at other AUC sites. WHITE stated that RIVERA called him an hour later stating she was taking him off the schedule and reducing his hours until the numbers picked up.

17. WHITE stated that he believed the patients did not want to see him because he was tapering patients off pain medicine and that the Medical Assistant's would state that patients would walk in and then immediately out when they saw WHITE was there and not NIKPARVAR-FARD.

18. WHITE stated that he was very strict in pain management and would try to taper down patients which would cause them to complain directly to him. WHITE stated he would continue a course of treatment if it came from a supervising physician. WHITE stated he did not believe there were employment consequences based on the prescriptions he wrote.

19. WHITE stated that he worked with Dr. Highland CAMPBELL who had told WHITE that he was a Medical Doctor with 15 years experience and certification in emergency medicine. WHITE stated that he met CAMPBELL at AUC in the fall of 2014 when CAMPBELL transferred from the Scranton AUC to City Line.

20. WHITE stated that he was approached by RIVERA and notified that CAMPBELL had let his "DEA lapse" and it "was pending." WHITE stated that RIVERA asked him to pre-sign schedule II prescriptions for CAMPBELL while CAMPBELL waited on his DEA Registration to be approved.

21. WHITE stated that he agreed to pre-sign the prescriptions and gave them directly to CAMPBELL every time; receiving some back from CAMPBELL at the end of the day after CAMPBELL saw approximately 80-90 patients, 70% being pain management.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. File Title | |
| NIKPARVAR-FARD, Dr. Mehdi | |

4. Page 4 of 7

5. Program Code: TDS-CK

6. Date Prepared: 05-15-2017

22. WHITE stated that CAMPBELL would see half and WHITE would see half; WHITE giving 15-20 pre-signed scripts to CAMPBELL at a time. WHITE stated that he did this as CAMPBELL was senior to him in years and competence.

23. WHITE stated that he (WHITE) started this practice around September 2014 and did it until January or February 2015. WHITE stated that based on his training and personal experience, he, at the time, believed CAMPBELL had a drug problem and that he (WHITE) suggested to RIVERA that CAMPBELL be drug tested. WHITE stated that he mentioned this to RIVERA on a daily basis.

24. WHITE stated that Physician's Assistant Jason DILLINGER and Dr. Matthew DEGIROLAMO also pre-signed prescriptions for CAMPBELL; all of them being concerned about the liability of doing so. WHITE stated that Physician's Assistant Samantha HOLLIS refused to pre-sign the prescriptions for CAMPBELL. WHITE stated that he understood NIKPARVAR-FARD was also pre-signing scripts for CAMPBELL.

25. WHITE stated that CAMPBELL would use his own (CAMPBELL's) name for non-controlled prescriptions and that he (WHITE) was too scared to complain to NIKPARVAR-FARD.

26. WHITE stated that he never personally saw anyone else (other than himself) give prescriptions to CAMPBELL.

27. WHITE stated that he told Office Manager/Medical Assistant Amara MIDDLEMAN that CAMPBELL should be drug tested and that JoAnn RIVERA consistently stated she (RIVERA) would handle the drug/script issue regarding CAMPBELL; however, nothing ever happened.

28. WHITE stated that he was paid $45 per hour while shadowing THOMPSON, then $50 per hour while working 90-100 hours per week. WHITE stated he received raises, receiving $52.50 and then $55.00 per hour. WHITE believed his annual salaries were: 2014/$70,000, 2015/$130,000, 2016/$70,000.

29. WHITE stated that he received a $100 bonus per day if he saw more than 100 patients and that all monies were sent via check and then direct deposit from Citizen's Bank.

30. WHITE stated that he first believed the pre-signing of scripts became wrong when he could not trust CAMPBELL; he further stated that he never should have done this activity at all. WHITE stated that Samantha HOLLIS had more experience and could refuse.

31. WHITE stated that there was no specific bonus for CAMPBELL writing the scripts, no tally of how many scripts given.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**
*(Continuation)*

| 1. File No | 2. G-DEP Identifier |
|---|---|
| | |

3. File Title
NIKPARVAR-FARD, Dr. Mehdi

4. Page 5 of 7

5. Program Code
TDS-CK

6. Date Prepared
05-15-2017

32. WHITE stated that he began to counter-sign the charts of patients CAMPBELL saw who required scripts signed by WHITE. WHITE stated that he never sat in an evaluation with CAMPBELL and that a countersign was after the fact; there never being a time in which a CAMPBELL script upon review by WHITE was cancelled after WHITE's chart review.

33. WHITE stated that he never took pills out of a person's possession based on file review.

34. WHITE stated that he had no formal pain management training, no Continuing Medical Education, only what he learned at AUC from DEGIROLAMO, NIKPARVAR-FARD, and THOMPSON.

35. WHITE stated the CAMPBELL called him on the day of the DEA Raid (July 9, 2015) and stated that CAMPBELL said the raid had nothing to do with WHITE. WHITE further stated that CAMPBELL asked WHITE for a recommendation for a teaching position.

36. WHITE stated that he never saw CAMPBELL and NIKPARVAR-FARD together.

37. WHITE stated that per RIVERA on behalf of NIKPARVAR-FARD, patients could be seen and receive scripts two (2) days prior to the prescription's renewal date. For example, a patient with a 20 day script could come for a re-fill script on day 18.

38. WHITE stated that 15/50 patients at City Line were not legitimate and 22 to 23/50 at Roosevelt Boulevard were not legitimate. WHITE stated that this was a consistent number his entire time there and that the lab results demonstrated the non-compliance.

39. WHITE stated that patients would consistently complain that they paid for 2 weeks or 3 weeks, or for a month's worth of pain medication. WHITE stated that patients were asked why they were not compliant per drug tests and that the answers were varied. WHITE stated that such patients were given a week's prescription by WHITE.

40. AUSA Bologna stated that he saw four (4) ways to fail a drug test at AUC: 1) prescribed medicine not in system; 2) illicit drug in system; 3) non-prescribed drug in system; or 4) evidence of tampering with sample. Based on that premise, AUSA Bologna asked WHITE how a patient would be discharged in each scenario. WHITE agreed that he (WHITE) would not discharge the patients but would give them a week's worth of medicine in each case (unless the evidence of heroin, in which case no medicine would be prescribed). WHITE would further advise such patients not to see him (WHITE) any further. WHITE stated that he would take the chart to RIVERA and advise that such patients needed to be discharged.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** (Continuation) | 1. File No. | 2. G-DEP Identifier |
| | 3. File Title NIKPARVAR-FARD, Dr. Mehdi | |
| 4. Page 6 of 7 | | |
| 5. Program Code TDS-CK | 6. Date Prepared 05-15-2017 | |

41. WHITE stated that he was trying to make best of bad situation and writing scripts not needed, but did not have a choice and continued trying until his hours were cut in April/May 2016.

42. WHITE stated that he at one point asked NIKPARVAR-FARD how he was practicing medicine if he (WHITE) was giving people scripts they did not need. WHITE stated that NIKPARVAR-FARD responded that he talked with patients and Medical Assistants who were not satisfied with WHITE and did not like WHITE. WHITE stated that NIKPARVAR-FARD stated that by looking at the numbers the patients were not being made happy.

43. WHITE stated that each month the practitioner would review the prior month's urine test and that there was no prescription review of other providers (outside of AUC) when WHITE was there.

44. WHITE stated that if correspondence arrived from other practitioners or sources regarding patients seeing multiple doctors (outside of AUC), he would deliver it to RIVERA because it would not be ethically appropriate to write scripts for such a person, however, WHITE stated such a document could become buried in the file.

45. WHITE stated that MRIs were required and verified by Medical Assistants and that patients presenting fake MRIs, doctor letters, or urines were confronted.

46. WHITE was not sure how a patient's identity was verified, other than a driver's license in the front of the file.

47. WHITE stated he did not know how cash was collected but that NIKPARVAR-FARD's wife, Niusah, would come and pick-up the day's money from RIVERA.

48. WHITE stated that per RIVERA he was to bill codes: 99213 and 99215 for patients: 99215 for established patients, 99213 for new patients. WHITE stated he stopped doing this after DEGIROLAMO told him to stop.

**INDEXING**



DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. File Title NIKPARVAR-FARD, Dr. Mehdi | |
| 4. Page 7 of 7 | | |
| 5. Program Code TDS-CK | 6. Date Prepared 05-15-2017 | |



DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.