**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 18-101-06** |
| | : | |
| **MITCHELL WHITE** | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT MITCHELL WHITE'S
MOTION TO DISMISS THE CHARGES AGAINST HIM**

Defendant Mitchell White, by and through undersigned counsel, submits this

memorandum in support of his motion to dismiss the charges against him.  For the reasons

discussed below, defendant believes the equities, evidence and caselaw supporting dismissal are

compelling.[1]

**I.      The Charges Against Mr. White Should Be Dismissed Due to Violation of Mr.
White's Constitutional Right to a Speedy Trial**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall

enjoy the right to a speedy and public trial."  U.S.Const. amend. VI.  (Whether or not the Speedy

Trial Act, discussed below, has been violated is immaterial.  The Speedy Trial Act explicitly

states that the statute should not "be interpreted as a bar to any claim of denial of speedy trial as

required by amendment VI of the Constitution."  18 U.S.C. §3173.)

To determine whether the constitutional right to a speedy trial has been violated, courts

consider the following four factors:  "(1) the length of the delay before trial;  (2)  the reason for

the delay and, specifically, whether the government or the defendant asserted his speedy trial

---

[1]      If, however, dismissal is not granted, Mr. White submits that  the Court should impose
remedial measures upon the government in response to its egregious and continued disregard of
its discovery obligations, as also discussed herein.

right; (3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered by the defendant." *United States v. Velazquez,* 749 F. 3d 161, 174 (3d Cir. 2014) citing *Barker v. Wingo*, 407 U.S. 514, 530-32.   "[N]o one factor is dispositive nor 'talismanic.' " *Velazquez, id.* at 174, *citing Hakeem v. Beyer*, 990 F. 2d 750, 770 (3d Cir. 1993), *quoting Barker*, 407 U.S. at 533.  *See also United States v. Alvin*, 30 F. Supp. 3d 323, 341 (E.D.Pa. 2014)(Schiller, J.).  The question before the Court is whether the delay so undermines the Court's confidence in the case that the court no longer believes a trial could result in a fair verdict.  *Alvin*, 30 F.Supp. at 339, *citing Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

### A.      The Length of Delay Is Presumptively Prejudicial

The first factor is actually "a double enquiry":

> Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness.  If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.  This latter enquiry is significant to the speedy trial analysis because…**the presumption that pretrial delay has prejudiced the accused intensifies over time.** *Id.*

*Doggett v. United States*, 505 U.S. 647, 652 (1992).  Thus, a court must first decide whether the delay is long enough to trigger the analysis of the remaining *Barker* factors. *Id.*  If it is, the length of the delay is also separately weighed in the court's analysis of the remaining factors.  *Id.*

Here, the delay has been over three and a half years – and will be four years at the time of the trial.  This is well beyond the minimum necessary to trigger review of the *Barker* factors.  The Third Circuit in *Velazquez* noted that a delay of fourteen months is "sufficient to trigger review of the remaining *Barker* factors":

> The Supreme Court has noted that 'the lower courts have generally found 'postaccusation delay' long enough to trigger further review of *Barker* factors 'at least as that delay approaches one year.' *Id.* at 652 n. 1. This Circuit has concluded that a delay of fourteen months is 'sufficient To trigger review of the remaining *Barker factors,'* *Battis* 589 F. 3d at 678 (citing *Hakeem*, 990 F. 2d at 760), and once that threshold has been passed, 'the state, not the prisoner, bears the burden to justify the delay." *Hakeem,* 990 F. 2d at 770.

*United States v. Velazquez,* 749 F. 3d 161, 174 (3d Cir. 2013).

Once the *Barker* factors are triggered, the Court must separately weigh the length of delay in its overall analysis as to whether a Speedy Trial violation has occurred.   The Third Circuit in *Velazquez* noted that excessive delay imperils the fairness and the public confidence in the trial: "[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."   *Id.*

In the case at hand, this factor should weigh heavily in the Court's analysis.  Four years is an excessively long time to await trial regardless of the cause of the delay.  The events in question in the indictment took place as early as 2013.  (Although the timeframe alleged in the Indictment is January 10, 2014 to August 31, 2017, the government's expert repeatedly relies on events and records dating back to 2013 in reaching his opinions.)  Relying on the memory of witnesses to reach back up to nine years hardly inspires confidence in the fairness of a trial.  In short, regardless of the causes of the delay, this significant passage of time cannot help but undermine confidence that a fair verdict can be reached.

**B.**  **Mr. White Asserted His Rights to a Speedy Trial and Was Not Responsible for the Trial Delays**

Mr. White should not bear responsibility under the constitution or the Speedy Trial Act for any continuance caused by the government's repeated failures to satisfy its discovery

obligations.  And his assertion of his Speedy Trial rights in December 2021 and May 2022 should carry weight in the Court's analysis.

The initial continuance – from April 20, 2020 to June 15, 2020 – would have occurred in the absence of COVID due to the government's tardy production of 46 patient files upon which its expert had relied in reaching his opinions.  Trial was originally scheduled for April 20, 2020. (Dkt. 134.)  Mr. White expected to be prepared to go to trial on that date.

As early as October 2019, counsel for Mr. White (as well as counsel for other defendants) advised the government that the discovery did not seem to include all of the patient files referenced in the government's expert report.  *See* Email from A. Flannery to J. Bologna dated October 22, 2019 (Exhibit A).  Counsel requested a full set of the patient files that had been provided to the expert.  The government informally advised counsel that it believed all pertinent patient files had been produced.[2]

But on February 27, 2020 the government produced 46 patient files comprising over 13,750 pages of medical records – patient files upon which its medical expert had relied. Government counsel advised defense counsel that "in preparing for the April 20th [2020] trial, the case agent recently discovered [that these files] had not been…provided in discovery" as intended.  Letter from J. Bologna to Defense Counsel, February 27, 2020 (Exhibit A to Defendant Mitchell White's Motion to Suspend Trial Date (Dkt. 410), filed under seal). Government counsel acknowledged at the time that this was "a mistake by the government in producing materials that are subject to Federal Rule of Criminal Procedure 16."  *Id.*

---

[2]     Given that various patients had multiple files at multiple locations, it was difficult for defense counsel to discern whether all patient files utilized by the government expert had been produced.

Given the nature, volume and timing of the late Rule 16 discovery production, the April 20, 2020 trial date did not allow adequate time for defense counsel to review and utilize the patient materials, which were among the central focus of the government's case and expert opinion.  The government's tardy discovery production caused Mr. White to request a continuance of the trial date in order to satisfy his constitutional and statutory rights to receive, review and utilize pertinent discovery and thereby have effective assistance of counsel.  (Dkt. 197.)

The COVID pandemic began to affect courthouse operations in March 2020.  Jury trials resumed in the fall of 2021.  While several *subsequent* continuances (up to the September 8, 2021 scheduling order setting trial for January 10, 2022) are attributable to the COVID pandemic, **the first continuance (from April 20, 2020 to June 15, 2020) would have occurred even in the absence of the pandemic due to the government's tardy production of a substantial number of patient files.**  That continuance, therefore, should be attributed to the government, not to Mr. White (or COVID).

Nor should continuance of the trial from January 10, 2022 to May 31, 2022 be attributed to Mr. White.  To the contrary, he asserted his constitutional and statutory Speedy Trial rights in opposition to a motion by a co-defendant to continue the trial.  Mr. White was prepared to proceed to trial on January 10, 2022.  In response to a December 16, 2021 motion by a co-defendant to continue the January 10 trial date (Dkt. 332), Mr. White objected and asserted his statutory and constitutional speedy trial rights.  (Dkt. 334.)  By December 31, 2021, however, there was a significant surge in the number of local cases of the Omicron COVID-19 variant.  Reiterating that he wanted the trial to go forward as soon as practicable, Mr. White acknowledged that a *short* continuance would be prudent since it was not in his interest for a trial

to be undertaken in fits and starts due to the likelihood of disruption from participants contracting or being exposed to COVID-19 in the anticipated Omicron surge immediately after the holidays.  Otherwise sought trial as promptly as possible.  (Dkt. 357.)

Mr. White did not request or concur in any request for a ***lengthy*** continuance – he concurred only in a "short continuance…until the holiday-generated surge recedes." *Id.*  The Court's decision to continue the trial for five months was not consistent with his request.  That continuance should not be attributed to Mr. White.  To the contrary, Mr. White asserted his Speedy Trial rights qualified only by the recognition that in early January 2022, public health conditions *temporarily* made such a large trial imprudent and potentially deleterious to other constitutional rights of Mr. White's, such as a jury drawn from a fair cross-section of the community and the right to confront witnesses against him.[3]

Mr. White was again prepared to go to trial on May 31, 2022.  Within weeks of the May 31, 2022 trial date, however, the government produced an avalanche of discovery.  *See* Letters from M. Costello to Defense Counsel dated April 29, 2022; May 4, 2022; and May 10, 2022. (Exhibit B to Defendant Mitchell White's Motion to Suspend Trial Date (Dkt. 410), filed under seal).  This discovery included information about previously undisclosed undercover operations, 60 hours of video footage, 16 hours of audio tape, patient files, search warrant photographs, interview reports and other investigatory records.

---

[3]      For example, the government advised the Court that one of its witnesses was pregnant and did not want to risk coming into the courtroom to testify. And the ability to have a full *voir dire* panel of potential jurors the second week of January given the upsurge in COVID cases was seriously in question – on information and belief, less than 30 jurors appeared in response to summonses for another trial the week before the scheduled trial date in this case, and that trial could not go forward.

Perhaps most egregiously as to Mr. White, the May 2022 late discovery contained clearly exculpatory evidence as to him that should have been produced over two years ago earlier under *Brady v. Maryland*.  Interview reports dated March 2020 – *over two years prior to production* -- revealed that the government interviewed a former AUC patient *three times* that month.  In each of these interviews, the witness told the government that at her last AUC visit she was seen by Mr. White, who counseled her to get off pain medications (which she then did).  This is clearly exculpatory material in the face of charges that Mr. White was complicit in operating an illegal drug house and that he conspired to distribute drugs illegally.

Mr. White again asserted his speedy trial rights in May 2022, both in the May 12, 2022 status conference and again in his Motion to Suspend Trial Date (Dkt. 410 at p. 4).   While he took the position (articulated at the May 12, 2022 status conference) that it would be prudent to postpone the trial ***briefly*** in anticipation of the Supreme Court's clarification of the good faith standard in its then soon-to-be-issued *Ruan* decision, Mr. White submitted that a continuance of no more than 30 days would be sufficient for this purpose. (*see* Defendant Mitchell White's Motion to Suspend Trial Date, Dkt. 410 at p. 4).   Beyond that short time period, he submitted that any continuance was at the hands of the government – caused by its grossly tardy discovery production.  He asserted his right to a speedy trial, which – as he noted then and submits now – could not and cannot be met consistently with his rights to due process and effective assistance of counsel due to the need to review and utilize the late-produced discovery. *See* Dkt. 410.

As anticipated, the Supreme Court issued its opinion in Ruan on June 27, 2002 – within 30 days of the May 31, 2022 trial date.  Yet the May 31, 2022 trial date was continued for much longer than that – to January 9, 2023  -  a time period necessary for defense counsels' review and utilization of the substantial and tardy discovery produced in May 2022.  **The seven months'**

7

continuance (to January 9, 2023) subsequent to the issuance of the *Ruan* decision must be attributed to the government's negligence in yet again producing highly tardy discovery.

### C.    Mr. White Has Been Prejudiced by the Delay

Prejudice to the defendant is not limited to prejudice in the trial proceedings:

> …[P]rejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. (footnote omitted).  Inordinate delay, 'wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and …may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.'

*Moore v. Arizona*, 414 U.S. at 190 (citations omitted).

Although not incarcerated, Mr. White has been seriously prejudiced by the pendency of these charges for almost four years.  He is 36 years old.  He cares very much about pursuing a career in medicine as a physician assistant.  Yet his career path has been thwarted for years due to the pendency of these charges.  At the time of indictment in January 2019, he was working as a physician assistant in the Delaware prison system, a job in which he took much pride and satisfaction.   His direct supervisors (with whom counsel has spoken) thought so highly of Mr. White and his work that they did not fire him after indictment despite being informed of the charges.   Due to the charges, however, in the spring of 2020 Mr. White was unable to renew the security and medical clearances necessary for working in the Department of Corrections.  He was therefore fired as of June 15, 2020.  Finding a job of equal substance was virtually impossible, as the Court's conditions of release have required him to advise any employer of the pendency of the charges against him.  He did find a job in a medical setting, but it is one that does not advance his career in the direction he would like to take.

Due to the pendency of the charges, coupled with the "on again/off again" approach and disappearance of trial dates, Mr. White has understandably suffered bouts of anxiety and depression which he continues to battle.

Mr. White will also inevitably suffer prejudice in the trial proceeding, whether or not it can be affirmatively demonstrated.  The Supreme Court in *Barker* expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial.  *Barker*, 407 U.S. at 533.  As the Supreme Court acknowledged in *Doggett*, "…we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter identify."  505 U.S. at 655.   Diminution of memory is inevitable.  It has been six to nine years since the events at issue took place.  Witnesses inevitably will have less recall of detail.

As Mr. White prepares (yet again) for trial, counsel may well find that defense witnesses being re-subpoenaed are no longer available or do not have the same recall they did in times past. Potential leads and witnesses currently being developed as a result of the recent discovery may be unfindable.  Mr. White requests leave to supplement this motion to demonstrate specific prejudice, as and when appropriate.

## II.    The Charges Against Mr. White Should Be Dismissed Due to Violation of Mr. White's Statutory Speedy Trial Right

The Speedy Trial Act – which is separate and apart from the constitutional right to a speedy trial[4]  -- requires that a defendant be brought to trial within 70 days of initial appearance, with certain specified exclusions.  *See* 18 U.S.C. §3161.

---

[4]     The Speedy Trial Act explicitly states that the statute should not "be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution."  18 U.S.C. §3173.

Mr. White objected (*see* Dkt. 410 at p. 8) – and continues to object  -  to the issuance of an "ends of justice" continuance under the statutory speedy trial clock for the period subsequent to the 30-day wait for the *Ruan* decision.  18 U.S.C. §3161(h)(7)(C) expressly provides that "[n]o ['ends of justice'] continuance…shall be granted because of general congestion of the court's calendar, **or lack of diligent preparation…on the part of the attorney for the Government**."  The Third Circuit has described "lack of diligent preparation" as encompassing discovery omissions when they are committed "chronically or in bad faith."  *United States v. Shulick*, 994 F.3d 123, 133 (3d Cir. 2021)(citing with approval cases from other circuits distinguishing "one off" discovery violations from those that are in bad faith *or* part of a chronic pattern).

The government's failure to meet its discovery obligations in this case has been the definition of "chronic" – persisting for a long time and constantly recurring.  The government's negligence is not an instance of a single piece of evidence being overlooked.  To the contrary, the government's violations of its discovery and *Brady* obligations have been repeated, extensive and on-going since the outset of discovery production.   Some examples:

**1. Failure to Produce All Relevant Patient Files Prior to the April 2020 Trial Date.**

As early as October 2019, counsel for Mr. White advised the government that the discovery did not seem to include all of the patient files referenced in the government's expert report.  *See* Email from A. Flannery to J. Bologna dated October 22, 2019 (Exhibit A).  Counsel requested a full set of patient files provided to the expert.  It was not until February 27, 2020 – *over four months later* – that the government finally acknowledged that all files had not been produced, and consequently produced the voluminous discovery that caused the continuance of the original (April 2020) trial date.

**2. Failure to Retain Agent Rough Notes of Mr. White's Proffer, and Failure to Disclose this for Over Two Years Despite Repeated Requests**

Beginning in September 2019, counsel for Mr. White repeatedly requested the rough notes of Mr. White's proffer interview in May of 2017.  *See* Declaration of Ann C. Flannery, attached as Exhibit B.   Present at the interview were agents from the FBI, the DEA, and two other agencies.

The Third Circuit has long required the retention of agent rough notes.  In 1977, the Third Circuit directed that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the appellant under the rule of *Brady v. Maryland ...* or the Jencks Act." *United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977).  In 1983, the Third Circuit expanded that rule to all agents of the government, and made it the government's responsibility to retain the notes for possible production.  "We therefore hold that, hereafter, the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced."   *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983).

Agents' rough notes of interview reports are often found to be *Brady* material.  *See, e.g., United States v. Pelullo*, 105 F.3d 117, 122-123 (3d Cir. 1997)(overturning conviction where rough notes inconsistent with agents' testimony had not been disclosed), *citing United States v. Ramos*, 27 F.3d 65 (3d Cir. 1994) (recognizing that rough notes often may constitute valuable *Brady* material); *United States v. Alvarez*, 86 F.3d 901 (9th Cir. 1996)(same).

In addition to being potential *Brady* material, rough notes of a **defendant's** statement have also been held to be discoverable under Rule 16(a)(1)(B)(ii), requiring disclosure of any written record containing the substance of any relevant oral statement made by a defendant if

11

made in response to interrogation by a person the defendant knew was a government agent.

*See, e.g., United States v. Clark*, 385 F.3d 609, 619 (6th Cir. 2004) (rough interview notes

discoverable under Rule 16(a)(1)(B)(ii) despite disclosure of agent's interview summary); *United*

*States v. Molina-Guevara*, 96 F.3d 698, 705 (3rd Cir. 1996) (remanding on other grounds but

noting that on remand, production of rough interview notes is required under Rule 16).

 Even more fundamentally, rough notes of a proffer are necessary to preparation of a

defense where, as here, the government seeks to restrain the defense in conformity with

statements purportedly made in the defendant's proffer.[5]  In counsel's experience, the rough

notes of a proffer can differ from the final report, and thereby either constrain the government's

use of the proffer or provide a basis for the defendant to argue against the admission of particular

statements contained in the final report but not in the rough notes.  In either case, knowledge by

defense counsel as to what appears in the rough notes of a proffer is important to preparation of a

defense.

 In making the request for the rough notes of Mr. White's proffer, counsel therefore

sought them as both Rule 16 material and also as potential *Brady/Giglio* material.  The proffer

report is dated over two weeks after the actual proffer, raising questions as to its accuracy.  Four

agents attended the proffer session, multiplying the question of rough notes.  The final report

contains statements that seem contradictory.  Moreover, counsel had (and continues to have) a

good faith belief that an inculpatory statement set forth in the final report was not made as

---

[5] *See* Government's Motion *in Limine* to Preclude Defendant from Taking a Position During Trial that Contradicts His Proffer Statements, April 4, 2022 (Dkt. 382) *and* Defendant Mitchell White's Response to Government's Motion *in Limine* to Preclude Defendant from Taking a Position During Trial that Contradicts his Proffer Statements, April 27, 2022 (redacted version filed at Dkt. 391; unredacted version filed under seal).

reported, and therefore sought the rough notes as potential *Giglio/Brady* material.  *See* Declaration of Ann C. Flannery (Exhibit B).

Between September 2019 and March 17, 2020 (before the first scheduled trial date), counsel for Mr. White made at least three requests (oral and written) for the rough notes.   The government continually advised that it was "checking" on the notes. *See* Declaration of Ann C. Flannery (Exhibit B) and the compilation of communications between the government and defense counsel, submitted under seal as Exhibit C.  Defense counsel put a "marker" on this issue at the status conference on March 17, 2020,  but did not seek the Court's intervention due to the government's representations that it would follow through.

Counsel for Mr. White renewed the request at least six more times, including by letter on June 10, 2021, by email on July 20, 2021, by phone on August 2, 2021, by email on December 15, 2021, by email on December 21, 2021, and by email on January 18, 2022.  *See* Exhibits B and C.  The government repeatedly said that it would "check."   The first time the government revealed the possibility that the notes did not exist was in August 2021, when AUSA Bologna stated that he "thought" the notes might have been written on a computer and not saved but rather "converted" into the final report.  Again, Mr. Bologna said that he would "check."   It was not until January 31, 2022   -- ***after at least nine inquiries over the course of 28 months*** -- that Mr. Bologna finally confirmed that the rough notes had not been retained – they had instead been "converted" into the final report – a fact which of itself is *Brady/Giglio* and in clear violation of Third Circuit requirements.

As a result of the government's extraordinary and inexplicable delay in responding to this simple request, defense counsel developed defense strategy and prepared for trial three times without knowing the contents or status of the agents' rough proffer notes.   Failure to retain the

rough notes is a breach of the discovery requirements in and of itself and will certainly be an issue if the government seeks to use any statements from the proffer at trial, as Mr. White's ability to challenge the accuracy of the final report has been seriously undermined. Failure to reveal this breach for well over two years despite persistent requests is yet another example of chronic discovery failings in this case.

### 3. Failure to Produce Exculpatory Statements by a Government Witness for Over Two Years.

The massive discovery production in May 2022 revealed that in March 2020 the government interviewed former AUC patient KR *three times* -- all prior to the scheduled April 20, 2020 trial. In each of these interviews, the witness told the government that at her last AUC visit she was seen by Mr. White, who counseled her to get off pain medications (which she then did). This is clearly exculpatory material in the face of charges that Mr. White was complicit in operating an illegal drug house and that he conspired to distribute drugs illegally.

The relevance of these statements could hardly have been missed by the government -- the interviews occurred while Mr. White was under indictment and facing an imminent April 20, 2020 trial date. Disturbingly, the case again almost proceeded to trial in January 2022 without these reports having been turned over to the defense. And the government let Mr. White undertake trial preparation yet again in the spring of 2022 without the requisite *Brady* disclosure.

### 4. Late Production of an Undercover Recording of a Key Government Witness

As discussed more fully in defendant Mehdi Nikparvar-Fard's Motion to Compel Discovery and Dismiss the Superseding Indictment (hereinafter "the Nikparvar-Fard Motion")[6],

---

[6] The Nikparvar-Fard Motion is expected to be filed contemporaneously with Mr. White's motion. Pertinent contents of that motion and memorandum in support are incorporated herein by reference.

14

the government failed to produce until May 2022 exculpatory or impeaching statements made by government witness JR on tape in 2017.

### 5.  Late Production of Surveillance Tapes

Despite the fact that the government plans to elicit testimony at trial (as supposedly incriminatory evidence) that there were lines of patients outside AUC offices, the government failed to produce until May 2022 years-old surveillance tape, some of which shows the outside of the offices with no one in the parking lot.  This, too, constitutes long overlooked *Brady* material, late-produced by the government.

### 6.  Failure to Produce Evidence About a Cooperating Witness's Cooperation

As discussed more fully in co-defendant the Nikparvar-Fard Motion, the government belatedly (in May 2022) revealed that one of its cooperating witnesses also cooperated in eight other investigations.  Not only is this late-produced *Giglio* material, it is incomplete.  The timing and substance of the cooperation – along with any benefits (tangible or intangible) the cooperator has or expects to receive from the government must be disclosed.

### 7.  Late Production of Other Brady and Rule 16 Materials

The Nikparvar-Fard Motion details other exculpatory, impeaching, and otherwise discoverable materials that the government produced late or has declined to produce.  Those details are incorporated by reference.

In short, the government's discovery breaches in this case have been chronic, repeated and excessive.  The government's conduct falls squarely within the Third Circuit's definition of "lack of diligent preparation" under 18 U.S.C. §3161(h)(7)(C).  *See Shulick, supra*.  Therefore an "ends of justice" continuance beyond the month-long period during which the *Ruan* decision was

awaited and issued is not available.   Because over 70 days unexcused days have passed since the *Ruan* decision was issued, the charges should be dismissed under the Speedy Trial Act.

### III.        Alternatively, the Indictment Should Be Dismissed Under Fed.R.Crim.P. 48(b)

As a result of the government's late production of discovery, it has caused unnecessary delay in bringing defendant to trial.  Federal Rule of Criminal Procedure 48(b) provides:

> (b)  By the Court.  The court may dismiss an indictment, information, or complaint if unnecessary delay occurs, in:
>
>> (1)  presenting a charge to a grand jury;
>> (2)  filing an information against a defendant; or
>> (3)  bringing a defendant to trial.

This rule serves a much broader function than simply implementing the Sixth Amendment guarantee of a speedy trial.  "The court's power to dismiss under Rule 48(b) is not limited to those situations in which the defendant's sixth amendment right to a speedy trial has been violated.  *United States v. Zabady*, 546 F. Supp. 35, 37 (M.D. Pa 1982) (citations and footnotes omitted).  Rule 48(b) allows for the dismissal of an indictment under less stringent standards than are required under the Sixth Amendment.  "Consequently it may be proper for a court to exercise its discretion to dismiss an indictment under Rule 48(b) even though the unreasonable delay in prosecuting does not rise to a constitutional violation." *Id.*

At issue in *Zabady* was the amount of  "prospective delay" involved before the government could be ready to proceed to trial, which amounted to approximately fifteen months. The trial court in *Zabady* held that "[c]onsideration of prospective, as well as retrospective, delay is appropriate under Fed. R. Crim. P. 48(b).  *Id. at 38 (citations omitted).*

The instant case also involves both retrospective delay and the "prospective delay" necessary for the defense to proceed to trial.  *Zabady* is analogous to the instant case because there the government embarked upon an "open-ended indictment process" whereby the

government indicted first and then lined up its case in the months after indictment.  The instant

case is far more egregious, because most of the evidence that the government failed to timely

produce had been in the government's possession for years.

> In dismissing the indictment under Rule 48(b), the trial court in *Zabady* held:

>> Considering that the Defendants have been the target of an investigation
>> for some time, we find that…**to now keep them under indictment and awaiting
>> trial for such a long period of time is clearly unconscionable.**  In our view,
>> such protracted post-indictment delay is patently inconsistent with society's
>> 'common interest that the government prosecute, not persecute, those whom
>> it accuses of a crime.'

*Id,*. at 39 (emphasis added), citing *Dicky v. Florida*, 398 U.S. 30, 43 (1970).

While the government in this case has repeatedly *claimed* it is "ready for trial," its

repeatedly tardy discovery and *Brady* productions reveal otherwise.[7]   Abiding by its discovery

responsibilities is part of the government's trial preparation – a part of the preparation that the

government has repeatedly ignored.   The government's tardy May 2022 production has caused a

protracted delay which, on top of the COVID delays, makes further prosecution (or

"persecution") of Mr. White unconscionable.

Rather than excusing the government, the COVID delays make the government's chronic

failure to meet its discovery obligations even more egregious.  The government had plenty of

time to fulfill its discovery obligations.   The government should have ensured that the case was

ready to try after the COVID shutdowns were lifted.  Instead, the government caused the trial to

be substantially postponed yet again – to the point that the trial is now literally set for four years

---

[7]      The government's pronouncement at the May 12, 2022 status hearing that ***it*** was not
requesting a continuance of the May 31, 2022 trial date was as audacious as its failure timely to
disclose *Brady* and *Giglio* material.   The government's position blatantly disregarded
defendant's constitutional right to effective assistance of counsel at trial – including the review
and utilization of discovery significant to the defense of the case.

after indictment.  Such unnecessary protraction of this already-delayed criminal case serves only
to punish Mr. White and prejudice his defense.  The charges should be dismissed before further
punishment and prejudice are inflicted.

### IV.   In the Alternative, the Court Should Impose Remedial Sanctions on the Government for its Chronic Failure to Abide by its Discovery Obligations.

Defendant believes the equities, evidence, caselaw and statutes supporting dismissal are
strong.  If, however, dismissal is not granted, Mr. White submits that in the alternative the Court
should impose remedial measures upon the government in response to its egregious and
continued disregard of its discovery obligations.

The Third Circuit has repeatedly confirmed that the Court has authority to impose such
sanctions.   *See, e.g., United States v. Shulick*, 994 F.3d 123, 133 (3d Cir. 2021)("Just as the
District Court here fashioned an appropriate continuance and sanction in response to the
Government's discovery practices **[by ordering that the government could not utilize late-
produced discovery at trial]**, so too will other trial judges craft an appropriate response on a
case-by-case basis.")  *See also United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009) ("When a
party fails to comply with [Federal Rule of Criminal Procedure 16, which governs discovery and
discovery violations], the district court is empowered to order that party to comply with the Rule,
grant a continuance, exclude the evidence, or enter other just relief.").

Remedial measures appropriate here include precluding the government from utilizing
against defendant the incredibly tardy discovery produced in May 2022 (as the district court did
in *Shulick*), and -- similarly – precluding the government from utilizing defendant's proffer
statement, due to its failure to abide by the clear the Third Circuit retention requirement its years-
long failure to disclose this breach of responsibility.   Defendant has been generally prejudiced in
many personal and substantive ways by the government's actions (and inaction).  Defendant has

been specifically prejudiced in connection with the agent rough notes, as the final report cannot

now be tested against and challenged by the rough notes.

## CONCLUSION

The discovery breaches in this case have been chronic and extraordinary.  The revelation

in May 2022 that the government had failed *for years* to produce a significant amount of

discovery and *Brady* material exemplifies and magnifies a chronic, years-long pattern in this case

of government disregard and negligence in attending to its responsibilities.   The government's

chronic negligence has created a situation in which Mr. White's statutory and constitutional

speedy trial rights have been and are being violated and cannot be met consistent with his Fifth

and Sixth Amendment rights to due process and the effective assistance of counsel.

Given its egregious discovery failings, the government should not be permitted to

prejudice and trample on Mr. White's rights by skating ahead to a trial as though nothing has

happened.  The delay has been both substantively and personally prejudicial to Mr. White.  The

charges against Mr. White should be dismissed.[8]

Respectfully submitted,

ANN C. FLANNERY
Law Offices of Ann C. Flannery, LLC
1835 Market Street, Suite 2900
Philadelphia, PA 19103
215.636.9002
*acf@annflannerylaw.com*
Attorney for Defendant Mitchell White

October 21, 2022

---

[8]      If the Court does not dismiss the charges, the Court alternatively should impose remedial
sanctions by precluding the government from utilizing the late-produced evidence and any
statement from Mr. White's proffer.

CERTIFICATE OF SERVICE

I, Ann C. Flannery, counsel for defendant Mitchell White, hereby certify that on this 21st day of October, 2022, I caused a true and correct copy of the foregoing Memorandum in Support of Defendant Mitchell White's Motion to Dismiss the Charges Against Him Due to Violation of His Speedy Trial Rights to be served via email upon counsel of record, including:

Christopher Parisi
U.S. Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Christopher.Parisi@usdoj.gov

Mary Kay Costello
U.S. Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
Marykay.Costello@usdoj.gov

_____
ANN C. FLANNERY
Law Offices of Ann C. Flannery, LLC
1835 Market Street, Suite 2900
Philadelphia, PA 19103
215.636.9002
acf@annflannerylaw.com